IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> LESTER MICHAEL ANDERSON, <br><br> Defendant. | MEMORANDUM DECISION AND ORDER GRANTING MOTION TO SUPPRESS <br><br> Case No. 2:21-cr-00115-JNP <br><br> District Judge Jill N. Parrish |

Before the court are defendant Lester Michael Anderson's motions to suppress evidence. ECF Nos. 31 & 32. The court GRANTS Anderson's motion to suppress evidence for violations of his Fourth Amendment rights. ECF No. 32. The court FINDS AS MOOT his motion to suppress evidence for alleged violations of his *Miranda* rights. ECF No. 31.

## FINDINGS OF FACT

Detective Orin Neal told Sergeant Corey Lavin he had received information that Anderson was distributing drugs, that he drove a green Nissan truck, and that he frequented a Motel 6 in Midvale, Utah. Around 1:30 a.m. on January 27, 2021, Sergeant Lavin drove through the parking lot of the Midvale Motel 6 and observed a green Nissan truck pull out of the parking lot. The driver of the truck failed to stop before the sidewalk and did not use a turn signal. Sergeant Lavin followed the truck. He ran the license plate and discovered that it was registered to Anderson.

Sergeant Lavin initiated a traffic stop based on the observed traffic violations. He approached the truck and asked Anderson for his driver's license. Anderson explained that he did not have one because it had been suspended. Anderson instead produced an ID card. Sergeant Lavin returned to his police vehicle and completed a records check. He confirmed that Anderson's

license had been suspended and discovered that he had several arrest warrants for traffic violations. Sergeant Lavin also ran an "involvement history" check in a database maintained by his department. The data base includes the names of individuals who have contacts with police officers and includes victims of crimes, suspects in investigations, and informants. The involvement history check revealed that Anderson's name came up several times. But Sergeant Lavin did not read the reports to determine the nature of Anderson's contacts with police.

By this point, Detective Neal had arrived at the scene of the traffic stop. Sergeant Lavin informed Detective Neal about what he had learned and what had transpired during the stop. Sergeant Lavin and Detective Neal approached the truck, and Sergeant Lavin asked Anderson to exit his vehicle. Sergeant Lavin testified that he commonly asks individuals to step out of their vehicles to prevent them from fleeing when he informs them of warrants for their arrest. After Anderson exited the truck, Sergeant Lavin told him about the warrants. Sergeant Lavin then asked Anderson whether there was anything of concern in his truck. Anderson initially responded in the negative but then stated that he did not think so. Sergeant Lavin asked Anderson to clarify his response. Anderson explained that he gave rides to drug users and that one of them may have left drug paraphernalia or drugs in his truck.

Detective Neal also asked Anderson whether there was anything illegal inside of his truck. Anderson responded that other individuals had been in his truck recently and that drug paraphernalia was likely inside the truck. Detective Neal asked for Anderson's consent to search the truck to confirm the information that he had provided. Anderson agreed.

A K-9 officer arrived at the traffic stop around the same time as Detective Neal. While Sergeant Lavin, Detective Neal, and Anderson were conversing near the truck, the K-9 officer walked his dog around the vehicle. The dog did not alert to the presence of drugs in the truck. The

duration of the traffic stop was not extended by the drug dog sniff. In addition to the K-9 officer, at least three other officers had arrived at the traffic stop by the time that Sergeant Lavin and Detective Neal had begun to question Anderson.

Detective Neal began to search the truck and found a loaded revolver almost immediately. After Anderson confirmed that he was a convicted felon, he was taken into custody. A continued search of the vehicle uncovered a large quantity of methamphetamine, a large quantity of cash, drug paraphernalia, packaging materials, and a digital scale. Sergeant Lavin also found user amounts of heroin in Anderson's pants pockets.

Detective Neal placed Anderson in his vehicle, warned him of his *Miranda* rights, and questioned him. Anderson admitted to distributing methamphetamine and to possessing the firearm for protection. Anderson also consented to a search of his hotel room. The officers transported him to his room at the Motel 6 and conducted a search. They then took Anderson back to his truck and released him.

The government later charged Anderson with three crimes based on the evidence that they discovered: (1) possession of methamphetamine with intent to distribute, (2) possession of a firearm by a felon, and (3) possession of a firearm in connection with a drug trafficking crime.

## ANALYSIS

Anderson moves to exclude two classes of evidence. First, he argues that the officers violated his Fourth Amendment rights by improperly extending the traffic stop, which gave the officers the opportunity to question Anderson about the contents of his truck and to obtain his consent to search the vehicle. Anderson contends that evidence obtained as a result of the search and incriminating statements that he made to the officers should be excluded as the fruit of this unconstitutional extension of the stop. Second, Anderson argues that the officers violated his

3

*Miranda* rights by asking him whether he had anything "of concern" or "illegal" inside his truck before informing him of his right to remain silent. Based on this alleged violation, he moves to exclude his statements to the officers.

The court agrees with Anderson that the officers violated his Fourth Amendment rights by unlawfully extending the traffic stop and that both the physical evidence obtained by the police and his incriminating statements must be excluded as the fruit of this violation. Because the court excludes Anderson's statements due to this Fourth Amendment violation, the court need not address his Fifth Amendment claim that the officers violated his *Miranda* rights.

I.       DURATION OF THE TRAFFIC STOP

The Fourth Amendment guards against "unreasonable searches and seizures." *United States v. Sharpe*, 470 U.S. 675, 682 (1985). A traffic stop for an observed traffic infraction is a reasonable seizure. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). But the duration of a traffic stop is limited to the time necessary to address the traffic violation that warranted the stop and to conduct "ordinary inquiries incident to [the traffic] stop." *Id* at 355 (alteration in original) (citation omitted). These ordinary inquiries include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id*. An officer may also take reasonable safety precautions during a traffic stop. *Id.* at 356. If an officer prolongs the stop beyond the time reasonably necessary to complete these tasks, the extension of the stop violates the driver's Fourth Amendment rights. *Id.* at 354; *United States v. Mayville*, 955 F.3d 825, 831 (10th Cir. 2020) ("[O]rdinary inquiries incident to a traffic stop and permissible safety precautions must be completed within a reasonable amount of time.").

Anderson concedes that Sergeant Lavin initiated a lawful traffic stop. But he argues that the officers improperly extended the stop by questioning him about topics outside of the scope of the traffic stop—i.e., by asking him whether there was anything "of concern" or "illegal" inside of his vehicle—and by conducting a drug dog sniff around his truck. Anderson asserts that this unlawful extension of the stop allowed the officers the opportunity to obtain incriminating statements and his consent to search the truck. Thus, he contends that that court should exclude all of his incriminating responses as well as the evidence recovered from the truck and his person as the fruit of this unlawful extension of the traffic stop.

The government argues that the officers did not unlawfully extend the traffic stop. First, it asserts that the officers' questions regarding the contents of the truck did not unlawfully extend the stop because this line of questioning was a permissible officer safety precaution. Second, it contends that the drug dog sniff, which occurred contemporaneously with the officers' interrogation, did not extend the stop.

The "'legitimate and weighty' interest in officer safety" may justify "certain negligibly burdensome precautions in order to complete [the officer's] mission safely." *Rodriguez*, 575 U.S. at 356 (citation omitted). For example, an officer may require the driver to exit the vehicle. *Id.* Inquiries as to whether the driver has a criminal history are also justified by officer safety. *United States v. Cone*, 868 F.3d 1150, 1153–54 (10th Cir. 2017). "What law enforcement may not do is divert from the mission of the stop in order to conduct general criminal interdiction or investigate other crimes." *United States v. Cortez*, 965 F.3d 827, 838 (10th Cir. 2020), *accord Rodriguez*, 575 U.S. at 356 ("On-scene investigation into other crimes . . . detours from [the traffic stop's] mission.").

Here, the officers extended the traffic stop to ask whether there was anything "of concern" or "illegal" inside of Anderson's truck. The government argues that these inquiries were justified by officer safety concerns because they allowed the officers to ascertain whether Anderson had any weapons in the vehicle. The court disagrees. First, Anderson was outside of his truck when the officers asked these questions. Because any weapons in the vehicle would have been well outside of his reach, these questions did not enhance the officers' safety. Second, the officers did not ask whether Anderson had any weapons inside of his truck. They asked whether there was anything "of concern" or "illegal" inside the vehicle. Although a weapon could fall within the rubric of an item "of concern" to a police officer, the broad terminology employed by the officers as well as the facts surrounding the traffic stop show that these questions were designed to elicit an admission as to the presence of anything illegal in Anderson's truck. In other words, the officers began to investigate their suspicion that Anderson was involved in drug trafficking rather than addressing legitimate officer safety concerns attendant to a traffic stop.

Thus, when the officers began to interrogate Anderson about the contents of his truck, they diverted from the mission of the traffic stop to investigate other crimes. At this point, the traffic stop no longer justified Anderson's continued detention. *See Cortez*, 965 F.3d at 838. Because the government does not contend that the officers had reasonable suspicion to support a continued investigative detention,[1] the officers violated Anderson's Fourth Amendment rights by extending the traffic stop. Moreover, the government does not contest that the extension of the stop led to Anderson's statements and the drug and gun evidence found in the truck and on his person.

---

[1] Sergeant Lavin testified that he did not have reasonable suspicion to believe that drugs were in the truck at the time of the traffic stop.

Because this evidence was the fruit of the unlawful detention, it is presumptively excluded from evidence. *See Segura v. United States*, 468 U.S. 796, 804 (1984) (holding that the exclusionary rule extends to "evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" (citation omitted)).

## II.   EXCEPTIONS TO THE EXCLUSIONARY RULE

The government argues that even if Anderson's Fourth Amendment rights had been violated, the evidence is nonetheless admissible under three exceptions to the exclusionary rule: attenuation, inevitable discovery, and independent source.

### A.   *Attenuation*

Under the attenuation doctrine, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Utah v. Strieff*, 579 U.S. 232, 238 (2016). When deciding whether this doctrine trumps the exclusionary rule, courts consider three factors:

> First, we look to the "temporal proximity" between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search. Second, we consider "the presence of intervening circumstances." Third, and "particularly" significant, we examine "the purpose and flagrancy of the official misconduct."

*Id.* at 239 (citations omitted). In *Strieff*, for example, the State of Utah conceded that an officer unlawfully detained a suspect for an investigatory stop. *Id.* at 236. As a result of the unlawful detention, the officer leaned of an outstanding warrant for a traffic violation. *Id.* at 235. The officer arrested the suspect pursuant to the warrant and discovered drug evidence when he conducted a

search pursuant to the arrest. *Id.* at 235–36. Applying the attenuation factors, the Court found that the close temporal proximity between the unlawful detention and the discovery of the drug evidence weighed in favor of exclusion. *Id.* at 239–40. But the discovery and execution of the arrest warrant after the unlawful detention was an intervening circumstance that strongly favored the State. *Id.* at 240–41. The absence of a purposeful or flagrant constitutional violation on the part of the officer also weighed against exclusion. *Id.* at 241. Applying these factors, the court held that the drug evidence was admissible because unlawful detention was sufficiently attenuated by the suspect's arrest for the traffic warrant. *Id.* at 242.

Here, the government argues that the existence of the traffic warrants for Anderson's arrest likewise constitute an intervening circumstance that justifies the application of the attenuation doctrine. The court disagrees. The application of the first and third attenuation factors in this case yield results similar to those found in *Strieff*. The temporal proximity factor favors Anderson because the illegal firearm was discovered within minutes of the officer's unlawful extension of the traffic stop. The flagrancy factor weighs in favor of the government because the officers' improper extension of a lawful traffic stop was not particularly egregious nor was it a willful violation of Andersons' rights. But unlike *Strieff*, the intervening circumstance factor strongly favors Anderson in this case. The existence of traffic warrants did not operate as an intervening circumstance because the officers never executed any of the warrants.

Under similar circumstances, the Tenth Circuit has found that the attenuation doctrine did not excuse a Fourth Amendment violation. In *United States v. Gaines*, 918 F.3d 793, 795–96 (10th Cir. 2019), officers seized a suspect to investigate an anonymous tip that an individual was selling drugs in a parking lot. As a result of the seizure, the officers observed an open container of alcohol in the suspect's vehicle and smelled PCP. *Id.* at 796. The officers arrested the suspect when he

attempted to flee and discovered incriminating evidence as a result of the arrest. *Id.* After the police had searched the suspect's car and found the evidence, the police discovered that the suspect had an outstanding arrest warrant. *Id.* at 800. The suspect moved to suppress the evidence on the grounds that the initial seizure was unconstitutional. The district court denied the motion, reasoning that the existence of the arrest warrant constituted an attenuating circumstance precluding exclusion of the evidence. *Id.* The Tenth Circuit disagreed. Rejecting the government's argument that the officers would have learned of the warrant if the suspect had not fled, the *Gaines* court held that the attenuation doctrine cannot be based on hypothetical scenarios: "[T]he attenuation doctrine addresses events as they actually occurred, not as they might have transpired. Thus, the arrest warrant and potential impoundment do not attenuate the connection between a possible Fourth Amendment violation and discovery of the evidence." *Id.* at 802.

In this case, the government also argues that the existence of warrants for Anderson's arrest constituted an intervening circumstance. It further contends that this case is distinguishable from *Gaines* because the officers knew about the warrants before they unlawfully extended the traffic stop. But this distinction does not save the government's attenuation argument. In order for the attenuation doctrine to apply, the link between unlawful police conduct and the discovery of the evidence must be "interrupted by some intervening circumstance." *Strieff*, 579 U.S. at 238. Mere knowledge of a warrant is not sufficient to qualify as an intervening circumstance. It is the execution of a valid warrant through an arrest that may justify the application of the attenuation doctrine. Because the officers never arrested Anderson, no intervening circumstance purged the taint of the unlawful extension of his detention. Accordingly, the attenuation doctrine does not permit the admission of the tainted evidence.

  B. *Inevitable Discovery*

Under the inevitable discovery doctrine, "the exclusionary rule does not apply if the government can prove by a preponderance[2] that 'the evidence inevitably would have been discovered by lawful means.'" *United States v. Braxton*, 61 F.4th 830, 833 (10th Cir. 2023) (citation omitted). "[T]he inevitable-discovery doctrine requires a counterfactual inquiry into what 'would have' happened under lawful circumstances." *Id.* The government argues that the inevitable discovery doctrine preempts the exclusionary rule in this case because if the officers had not unlawfully extended the stop, they would have chosen to execute the warrants for Anderson's arrest. The government further speculates that if the officers had arrested Anderson, they would have impounded his truck and discovered the gun and drug evidence through an inventory search.

But the government has failed to shoulder its burden of proving the first step in the layers of contingencies that could have led to the lawful discovery of the evidence. It has not produced

---

[2] In *United States v. Souza*, 223 F.3d 1197, 1203 (10th Cir. 2000), the Tenth Circuit confirmed the preponderance standard for proving inevitable discovery: "The government has the burden of proving by a preponderance of the evidence that the evidence in question would have been discovered in the absence of the Fourth Amendment violation." But later on in the opinion, the *Souza* court stated: "[A] court may apply the inevitable discovery exception only when it has a high level of confidence that the warrant in fact would have been issued and that the specific evidence in question would have been obtained by lawful means." *Id.* at 1205. At least one subsequent Tenth Circuit opinion references both the preponderance standard and the high level of confidence standard when applying the inevitable discovery doctrine in the context of a warrantless search. *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005).

Citing *Souza*, Anderson urges the court to apply the high level of confidence standard to the government's inevitable discovery claim in this case. Admittedly, there is a considerable amount of internal tension between the statements made in Souza regarding the proper standard of proof. But the Supreme Court has explicitly rejected an argument that the standard of proof should be more stringent than preponderance when deciding an inevitable discovery claim. *Nix v. Williams*, 467 U.S. 431, 444 & n.5 (1984). Moreover, the Tenth Circuit, both before and after *Souza*, has reiterated the preponderance standard. *See, e.g., United States v. Neugin*, 958 F.3d 924, 932 (10th Cir. 2020); *United States v. Eylicio-Montoya*, 70 F.3d 1158, 1165 (10th Cir. 1995). Accordingly, the court applies the preponderance standard of proof here.

evidence that the officers would have arrested Anderson on the traffic warrants or for driving on the suspended license. When questioned on this subject, Sergeant Lavin testified that he could have arrested Anderson when he learned of the warrants and his suspended driver's license. He did not state that he would have arrested him. The fact that the officers ultimately chose not to arrest Anderson demonstrates that executing the warrants was a matter of discretion. The government has failed to produce any evidence that the officers would have exercised their discretion to arrest Anderson. For example, the government did not produce evidence regarding the police department's policies for executing traffic warrants. Nor did it elicit evidence regarding the officers' general practices when warrants for traffic violations are discovered. Absent any evidence as to what the officers would have done, the court may not speculate that they would have arrested Anderson if they had not unlawfully extended the stop. *See United States v. Neugin*, 958 F.3d 924, 932 (10th Cir. 2020) ("In determining whether the government has met its burden of proof, we consider 'demonstrated historical facts,' not 'speculative elements.'" (citation omitted)).

The cases cited by the government do not support its inevitable discovery claim. Although the Tenth Circuit has applied the inevitable discovery doctrine to admit evidence discovered during a vehicle search on several occasions, the issue addressed in those case was whether the evidence would have been discovered during an inventory search *after* officers had already arrested the defendant on an outstanding warrant. *United States v. Tueller*, 349 F.3d 1239, 1244–45 (10th Cir. 2003) (holding that after a lawful arrest on outstanding warrants, officers would have inevitably discovered drug and firearm evidence during an inventory search by breaking a lock to a vehicle's trunk if they had not discovered a key through a drug dog sniff); *United States v. Haro-Salcedo*, 107 F.3d 769, 773–74 (10th Cir. 1997) (holding that although drug evidence was uncovered during an unlawful investigatory search of a vehicle after the occupants were arrested on outstanding

11

warrants, the evidence would have been inevitably discovered during an inventory search of the vehicle); *United States v. Horn*, 970 F.2d 728, 732 (10th Cir. 1992) (holding that gun evidence would have been inevitably discovered during an inventory search after an officer arrested the driver on an outstanding warrant); *United States v. Baskin*, 120 F. App'x 223, 224 (10th Cir. 2004) (unpublished) (affirming the district court's ruling that after officers arrested the defendant on an outstanding warrant, they would have inevitably discovered a firearm pursuant to an inventory search). Here, the threshold issue is whether the officers, contrary to the choice they actually made to release Anderson, would have arrested him if they had not unlawfully extended the traffic stop. Because the government has not met its burden of proving what would have happened in this hypothetical scenario, the court finds that the inevitable discovery doctrine does not counteract the exclusionary rule in this case.

    C.    *Independent Source*

"The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation." *Nix v. Williams*, 467 U.S. 431, 443 (1984). "A source is genuinely independent if the government can show that the evidence was obtained by 'means sufficiently distinguishable to be purged of the primary taint.'" *United States v. Forbes*, 528 F.3d 1273, 1278 (10th Cir. 2008) (citation omitted). "By contrast, a source is not independent if, 'granting establishment of the primary illegality, [the evidence has] been come at by the exploitation of the illegality.'" *Id.* (alteration in original) (citation omitted). "The government bears the burden of showing, by a preponderance of the evidence, that there is truly an independent source for the challenged evidence." *Id.* at 1279.

    The government argues that Anderson's consent to search the vehicle constituted an independent source for the evidence recovered from the truck and his person. The court disagrees.

Anderson's consent to search the truck is not "wholly independent" from the unlawful extension of the traffic stop because the officers obtained his consent during the unlawful extension of the stop. Thus, the independent source doctrine does not apply because the unlawful extension gave the officers the opportunity to obtain Anderson's consent.

## CONCLUSION

For the above-stated reasons, the court finds that the officers violated Anderson's Fourth Amendment rights by unlawfully extending the duration of the traffic stop. The court further finds that the government has not proven that an exception to the exclusionary rule permits evidence obtained due to this violation to be offered at trial. Accordingly, the court excludes evidence recovered from Anderson's truck, evidence found on his person, and statements Anderson made to the officers after the illegal extension of the stop.

According to the court's calculations, 89 days passed under the Speedy Trial Act. Upon entry of this order, the speedy trial clock will again commence.

DATED December 5, 2023.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge